UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES CLARK CATHEY,

    Plaintiff,                        Civil Action No. 14-10986

        v.                       District Judge GEORGE CARAM STEEH
                                     Magistrate Judge R. STEVEN WHALEN

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff James Clark Cathey ("Plaintiff"), brings this action under 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act and the partial denial of his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. The parties have filed cross-motions for summary judgment which have been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B). For the reasons discussed below, I recommend that Defendant's Motion for Summary Judgment be GRANTED, and that Plaintiff's Motion for Summary Judgment be DENIED.

## PROCEDURAL HISTORY

On April 25, 2012, Plaintiff applied for DIB (Tr. 166-167) and SSI (160-165),

alleging disability as of December 30, 2009. After the initial denial of the claim, Plaintiff requested an administrative hearing, held on July 17, 2013 in Livonia, Michigan (Tr. 34). Administrative Law Judge ("ALJ") Anthony R. Smereka presided. Plaintiff, represented by attorney Bethany Versical, testified (Tr. 39-60), as did Vocational Expert ("VE") Annette Holder (Tr. 60-67). On September 5, 2013, ALJ Smereka issued a partially favorable decision, finding that while Plaintiff was not disabled on or prior to his last date insured for DIB of December 31, 2011, he was entitled to SSI as a result of a disability beginning on April 5, 2012[1]  (Tr. 20-29). On Feburary 7, 2014, the Appeals Council denied review (Tr. 1-6). Plaintiff filed the present action on March 6, 2014.

## BACKGROUND FACTS

Plaintiff, born April 9, 1954, was 59 at the time of the administrative decision (Tr. 29, 160). He completed 12th grade and worked previously as a security officer and security guard (Tr. 187). He stopped working on March 29, 2006 after losing his driver's license (Tr. 186). He alleges disability as a result of knee injuries, hypertension, diabetes, fatigue, chronic pain, and glaucoma (Tr. 185).

---

[1] The SSA awards DIB to disabled persons based on their past earnings and payment of social security taxes pursuant to Title II of the Social Security Act, 42 U.S.C. § 423. The SSA provides SSI to disabled individuals on the basis of financial need, pursuant to Title XVI of the Social Security Act. *U.S. v. Smith,* 294 F.Supp.2d 920, 922 (E.D.Mich. 2003); 42 U.S.C. § 1381 *et seq.*

### A. Plaintiff's Testimony

*Plaintiff's attorney prefaced her client's testimony by amending the alleged onset of disability date to April 25, 2010* (Tr. 37).

Plaintiff offered the following testimony:

He worked as a security officer for a bank between 1979 and 1994 and as a security service guard from 1997 to 2006 (Tr. 39). In the security service guard position, he supervised 25 individuals (Tr. 40). He spent six to seven hours each day "on his feet" (Tr. 41). He stopped working in 2006 when his driver's license was revoked after a DUI conviction (Tr. 42).

Plaintiff currently weighed 350 pounds, having gained 50 pounds due to inactivity since he stopped working (Tr. 44). In December, 2009, he went to the doctor after his knee spontaneously buckled in a grocery store parking lot, but did not seek hospital treatment until April, 2010 (Tr. 45). In December, 2009, Plaintiff was prescribed pain medication for a pulled or torn ligament but did not undergo further diagnostic testing due to his lack of health insurance (Tr. 46). He sought hospitable treatment in April, 2010 after his knee condition became worse (Tr. 46). He was again given pain medication but was told that he required an MRI (Tr. 46). He was unable to put any weight on his left knee (Tr. 47). He further injured the knee in April, 2012 while jumping out of a burning car, noting that he "went one way," and his knee "went the other . . ." (Tr. 47). After the April, 2012 injury, Plaintiff was diagnosed with torn cartilage and arthritis and advised to undergo knee surgery (Tr. 47).

Plaintiff filed for food stamps in 2008 and had been approved for state sponsored medical insurance the week before the hearing (Tr. 47). Since beginning medication for diabetes in 2011, his blood sugar levels had stabilized (Tr. 48). Before being approved for subsidized insurance, he had seen a physician once every three months for blood pressure and pain medication (Tr. 49). He had elevated his leg to waist level for around two hours each day since 2010 (Tr. 49). He received a brace for the leg at the April, 2010 hospital visit (Tr. 50).

In response to questioning by his attorney, Plaintiff reported that he experienced fatigue due to diabetes as far back as 2010 (Tr. 51). The fatigue had not improved since beginning the use of insulin in 2011 (Tr. 52). He was required to elevate his legs due to swelling (Tr. 54). Walking for extended periods also caused leg swelling (Tr. 54). On a scale of 1 to 10, he experienced level "6" pain (Tr. 55). He had significant concentrational problems (Tr. 55). He slept restlessly due to knee problems since April, 2010 (Tr. 56). He experienced daytime sleepiness (Tr. 57). He was able to drive short distances, noting that he experienced intermittent "popping" of one knee or the other (Tr. 57). He was currently taking Tramadol, noting that the medication did not prevent him from driving (Tr. 58-59). He occasionally experienced light-headedness from blood pressure medication (Tr. 59). He reported difficulty climbing and descending stairs and the inability to stand for long periods (Tr. 60).

**B.     Medical Evidence**

### 1. Records Created Before April 5, 2012

In December, 2009, Plaintiff sought treatment after experiencing severe left knee pain (Tr. 33). Allan Birk, D.O. noted tenderness of the lateral aspect of the left knee "possibly due to a tear of the tendon ligament . . ." (Tr. 333). He observed that Plaintiff experienced difficulty "walking or bearing weight" on the left knee (Tr. 333). Dr. Birk advised Plaintiff to seek emergency treatment, and prescribed Motrin 800, stating that he would see Plaintiff "as needed" (Tr. 333).

In February, 2010, Dr. Burke noted tenderness of the left knee (Tr. 335). In April, 2010, Plaintiff sought emergency treatment for left knee pain (Tr. 298). Plaintiff, noting the presence of knee problems since December, 2009, reported that his left knee "gave out while he was in the shower" (Tr. 304). Plaintiff demonstrated 5/5 knee strength (Tr. 306). Treating staff referred him for an MRI (Tr. 307). Plaintiff referenced "some type of form [from] his insurance company" which would have to be completed before an MRI could be approved (Tr. 307). Treating staff declined to x-ray the knee because the problems appeared to be of a "ligament nature" (Tr. 307). The knee was wrapped with an Ace bandage (Tr. 307). Plaintiff was prescribed Motrin and Vicodin (Tr. 307). Followup notes by Dr. Birk state that Plaintiff experienced difficulty obtaining an MRI referral and was advised to speak with his case manager (Tr. 338). In August, 2010, Dr. Birk reiterated that the left knee should be examined by an orthopedist (Tr. 339). February, 2011 treating notes by Dr. Birk state that

Plaintiff experienced arthritis of the knees creating "severe palpable tenderness" (Tr. 274). June, 2011 treating records again note "severe palpable tenderness" of the left knee (Tr. 272). September, 2011 treating records again note the knee condition, but state that Plaintiff exhibited a normal gait (Tr. 270). December, 2011 records also show a normal gait (Tr. 269). March, 2012 records likewise state that Plaintiff exhibited a normal gait (Tr. 267).

### 2. Records Created On or After April 5, 2012

On April 5, 2012, Plaintiff sought emergency care after injuring his left knee while jumping out of a burning car (Tr. 257). Plaintiff reported a medical history of hypertension but denied a history of "knee surgery or pain" (Tr. 257-258). He noted that the left knee pain was aggravated "by full extension of the leg and walking up the stairs" (Tr. 258). Treating notes state that the knee pain was "trauma related" (Tr. 258). Plaintiff was given a knee brace and crutches and advised to ice and elevate the knee (Tr. 259, 263). He was prescribed Vicodin (Tr. 259). An x-ray of the left knee showed "degenerative osteoarthritic changes of the left knee without evidence of recent fracture" (Tr. 260). In May, 2012, Dr. Birk noted that Plaintiff had recently lost 10 pounds (Tr. 365). June, 2012 treating notes by Dr. Birk state that Plaintiff recently developed back pain while working on his car (Tr. 331). The same month, an MRI of the left knee showed "degenerative meniscus tears both medially and laterally" (Tr. 328). Dr. Birk referred Plaintiff to a orthopedist, noting that the wait to obtain the MRI was attributable to a delay in the automobile insurance company approval (Tr. 330). A July, 2012 ophthalmological exam was essentially unremarkable (Tr. 286).

In September, 2012, Dr. Birk completed an assessment of Plaintiff's work-related abilities, finding that Plaintiff was unable to sit, stand, or walk for even one hour in an eight-hour workday (Tr. 291). He found that Plaintiff was precluded from lifting even five pounds (Tr. 291). Dr. Birk found the absence of manipulative limitations (Tr. 291). He found that Plaintiff was unable to perform sustained pushing or pulling in the lower extremities (Tr. 292). He noted that Plaintiff had been referred to an orthopedist for a meniscus tear of the left knee (Tr. 292).

In January, 2013, James Fuller, vocational specialist, noted that Plaintiff reported knee problems as of December, 2009 which were "compounded" in the April, 2012 accident (Tr. 324). Plaintiff continued to use the knee brace prescribed in April, 2012 as well as a cane (Tr. 324). Fuller acknowledged Dr. Birk's September, 2012 finding that Plaintiff was unable to perform even one hour of walking, standing, or sitting in an eight-hour period (Tr. 325). Fuller found that due to Plaintiff's need to elevate his leg 18 to 24 inches constantly would preclude all work (Tr. 325-327).

### 3. A Record Submitted After the ALJ's Setember 5, 2013 Decision[2]

June 21, 2012 treating notes by Dr. Birk state that Plaintiff was referred for an MRI after left knee x-rays taken following the April, 2012 accident were "suspicious for torn

---

[2] Under the sixth sentence of 42 U.S.C. § 405(g) a claimant submitting material subsequent to the ALJ's decision, must show that (1) the evidence is "material" to the ALJ's decision and, (2) good cause exists for its tardy submission. *Id.* Plaintiff does not cite these records in his argument for remand or argue that they are material to the administrative findings, much less that good cause exists for their late submission.

cartilage of the left knee (Tr. 346). Dr. Birk noted "tenderness and swelling" of the left knee "secondary to torn menisci" (Tr. 346).

### C. Vocational Expert Testimony

VE Annette Holder testified that the inability to walk for more than two hours in an eight-hour workday would preclude Plaintiff's past jobs (Tr. 62). The ALJ then described a hypothetical individual of Plaintiff's age, education, and work experience:

> [A]ssume an individual . . . with the ability for light work [3] . . . . It involves the ability to stand and walk six out of eight hours, but I would like you to restrict standing and walking to no more than two out of eight hours. I restrict him from any hazards, and this includes work at unprotected heights or around dangerous moving machinery, and from any climbing of any ladders, ropes, or scaffolds. No more than occasional climbing of ramps or stairs and this person would also need to elevate . . . a leg to foot stool height. Let's also add no use of left leg for push controls like a clutch. If you were to assume these restrictions, would there be any jobs that this person could perform . . . ? (Tr. 62-63).

In response, the VE noted that in effect, the limitation to a range of unskilled light work would render a finding of disability as of Plaintiff's 55th birthday[4] (April 9, 2009)(Tr.

---

[3] 20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

[4] A determination that an individual 55 or older is capable of only unskilled, exertionally light or sedentary work generally directs a finding of disability. *Preslar v. Secretary of Health and Human Services,* 14 F.3d 1107, 1111 (6th Cir.1994); 20 C.F.R. §

64).

### D. The ALJ's Decision[5]

On September 5, 2013, Anthoony R. Smereka issued a partially favorable decision, finding that Plaintiff was not disabled between April 24, 2010 and April 4, 2012 but experienced disability as of April 5, 2012 (Tr. 20-29). Citing the medical records created before April 5, 2012, the ALJ found that Plaintiff experienced the severe impairments of "arthritis of the knees, diabetes mellitus, hypertension, and obesity" but that none of the conditions met or equaled any impairment listed in 20 CRF Part 404, Subpart P, Appendix 1 (Tr. 22-23). The ALJ found that from April 24, 2010 through April 4, 2012, Plaintiff retained the residual functional capacity ("RFC") for exertionally medium work with the following additional restrictions:

> [O]nly occasionally kneel or crawl, and never climb ladders, scaffolds, or ropes (Tr. 23).

He found that through April 4, 2012, Plaintiff was capable of performing his past relevant work as a security guard supervisor as actually performed and as generally performed in the national economy (Tr. 26-27). The ALJ found that as of the April 5, 2012 motor vehicle accident, Plaintiff was limited to a limited range of sedentary work which would

---

404, Subpart P, App. 2, Rule 202.04; *See also Parks v. Commissioner of Social Sec.,* 2014 WL 1305033, *10 (E.D.Mich. March 31, 2014).

[5]The ALJ's sequential findings regarding Plaintiff's condition from January 16, 2010 forward (supporting a finding of disability as of that date) are not in dispute and are thus omitted from discussion in this section.

automatically render him disabled (Tr. 25). *See* fn 4, above.

The ALJ supported the partially favorable decision by noting "highly limited evidence of treatment prior to April 5, 2012" (Tr. 24). The ALJ cited the April, 2010 hospital records showing no "gait disturbance" and full muscle strength, reflexes, and sensation" (Tr. 24). He found "no evidence" that arthritis of the knees would prevent the performance of medium work before April 5, 2012 (Tr. 25). The ALJ noted that the records between 2009 and 2012 for the conditions of hypertension and diabetes failed to show that those or any other conditions created disability (Tr. 25). He noted that imaging studies taken after the April 5, 2012 accident show degenerative meniscal tears to the left knee and edema (Tr. 26).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir.

1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

### Substantial Evidence Supports the Determination that Plaintiff was Not Disabled Before the Expiration of DIB

Plaintiff argues that the medical transcript supports a finding that he was disabled as of the April 24, 2010 emergency room visit rather than the April 5, 2012 automotive accident. *Plaintiff's Brief,* 9-15, *Docket #15.* He argues that the treating records created between April 24, 2010 and the December 31, 2011 establish disability before the December 31, 2011 expiration of DIB benefits.[6] *Id.* He notes that the dearth of objective studies for the period before the expiration of DIB is attributable to his limited access to health care. *Id.* at 14. He argues that the ALJ failed to consider his limited resources in making the non-disability finding.

---

[6] Entitlement to DIB under Title II of the Social Security Act is based on a finding of medical disability and a claimant's earning record. "An applicant's 'insured status' is generally dependent upon a ratio of accumulated 'quarters of coverage' to total quarters." *Arnone v. Bowen*, 882 F.2d 34, 37 (2nd Cir.1989) (citing 42 U.S.C. § 423(c)(1)(B); 20 C.F.R. § § 404.101(a), 404.130–404.133 (1988)). "'Quarters of coverage' " include quarters in which the applicant earned certain amounts of wages or self-employment income." *Id.* (citing 20 C.F.R. §§ 404.101(b), 404.140–404.146 (1988)). To be entitled to DIB, a claimant must show that he was disabled prior to his date last insured ("DLI"). 20 C.F.R. § § 404.315(a)(1), 404.320(b)(2). In contrast, for an award of SSI benefits under Title XVI, a claimant must establish disability and financial need. *Willis v. Sullivan*, 931 F.2d 390, 392, fn. 1 (6th Cir.1991); 42 U.S.C. § 1382. Regardless of the alleged date of disability onset, SSI applicants are not entitled to benefits until "the month following the month" that the application was filed. 20 C.F.R. § 416.335.

Plaintiff is correct that the ALJ was required to consider possible explanations for the limited records created before December 31, 2011. Pursuant to SSR 96-7p, 1996 WL 374186, *7 (1996), an ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." *See also* SSR 82-59, 1982 WL 31384, *4 (1982)(The ALJ must consider an individual's claim he is unable to afford the prescribed treatment).

To be sure, the ALJ's partially favorable determination does not explicitly mention Plaintiff's financial limitations. However, there is no indication that the ALJ did not consider the effects of the financial constraints when discounting the allegations of disability prior to December 31, 2011. The ALJ elicited Plaintiff's testimony regarding his lack of health insurance for the disputed period (Tr. 47). Plaintiff testified that he was eligible for food stamps as far back as 2008 (Tr. 47). While Plaintiff criticizes the ALJ's observation that he had not obtained an orthopedic evaluation (Tr. 24), this finding is preceded by a thorough discussion of Dr. Birk's treating observations of including "intact motor strength, sensation, . . . deep tendon reflexes, and [a] normal gait (Tr. 24). The ALJ's observation, read in context, does not appear to fault Plaintiff for the failure to obtain specialized care. The ALJ's observation is more reasonably read to state that the Dr. Birk's records, with nothing more, constitute substantial evidence in support of the non-disability finding.

Assuming that Plaintiff was unable to obtain an MRI before June, 2012 due to financial constraints, the existing medical records created before the April 5, 2012 accident (as opposed to the *absence* of objective studies) amply support the non-disability finding. Although in December, 2009, Dr. Birk advised Plaintiff to obtain emergency treatment for the left knee complaint, Plaintiff did not seek emergency treatment until April 24, 2010. The four-month lapse between the initial complaint and the emergency treatment suggests that the knee problems did not create significant functional limitations. Notably, during the four-month lapse between the recommendation and emergency room treatment, treating records state that Plaintiff exhibited a normal gait despite the reported knee pain (Tr. 335). The treating notes do not state that additional treatment for the knee condition was required (Tr. 335).

Likewise, the April 24, 2010 emergency room records do not suggest that Plaintiff became disabled on that date. As noted by the ALJ, the April 24, 2010 records state that Plaintiff demonstrated 5/5 muscle strength of the left knee (Tr. 307). Treating staff declined to order an x-ray (Tr. 307). Plaintiff's knee was wrapped in an Ace bandage and he was prescribed temporary pain medication[7] (Tr. 307). To be sure, Plaintiff's financial limitations prevented him from obtaining an MRI as recommended by emergency room staff or the orthopedic consult recommended by Dr. Birk (Tr. 307, 339). On the other hand, treating

---

[7] Plaintiff's testimony that he received a knee brace during the April, 2010 emergency treatment is not supported by those records (Tr. 50, 307).

records created between February, 2010 and April 5, 2012 indicate no worsening of Plaintiff's condition. To the contrary, the evidence created during this period indicate that Plaintiff exhibited a normal gait and did not experience edema (Tr. 267, 269, 272, 274).

Further, the ALJ did not err in finding that Plaintiff became disabled on April 5, 2012. In contrast to the April, 2010 hospital records showing that Plaintiff was treated with an Ace bandage, the April 5, 2012 emergency treatment notes state that Plaintiff was immediately prescribed a knee brace and crutches and advised to elevate and ice the knee (Tr. 259, 264). He exhibited edema (Tr. 259, 264). Plaintiff's claim that he was disabled almost a year before the April 5, 2012 accident stands at odds with his April, 2012 denial of a history of knee pain (Tr. 257-258). Moreover, while Plaintiff initially alleged disability as of December 30, 2009, he did not apply for disability benefits until three weeks after the April 5, 2012 accident.

Plaintiff argues that the meniscus tears revealed by the June, 2012 MRI reflected long-term, cumulative changes predating the April 5, 2012 accident. *Plaintiff's Brief* at 12. However, substantial evidence supports the ALJ's conclusion that Plaintiff did not experienced disability level knee problems before the April 5, 2012 injury. First, Plaintiff acknowledged that the April, 2012 accident exacerbated his knee problems, stating that at the time of the car fire, he jumped "one way," and his knee "went the other way" (Tr. 47). Second, the April 5, 2012 emergency room notes state that Plaintiff's current knee pain was "trauma related," suggesting that it was attributable to the accident the same day rather than

a gradually worsening of the condition (Tr. 258).  Third,  the vocational expert's January, 2013 evaluation (stating that the knee problems were "compounded" in the April, 2012 accident) support the conclusion that Plaintiff's condition took an abrupt and disabling turn at the time of the accident..

For overlapping reasons, I disagree with Plaintiff's contention that the ALJ was required to adopt Plaintiff's alleged onset date of April 24, 2010. *Plaintiff's Brief* at 12-13 (citing SSR 83–20,  1983 WL 31249, *3 (1983))("In determining the date of onset of disability, the date alleged by the individual should be used if it is consistent with all the evidence available").   In fact, the evidence predating April 5, 2012 suggests that while Plaintiff experienced some level of limitation as a knee problems, the condition was not disabling.   Plaintiff's implied argument that the ALJ failed support his finding of non-disability prior to April 5, 2012 misstates the applicable law.  Pursuant to 20 CFR § 404.1512(a), a claimant is required to "'furnish medical and other evidence that [the SSA] can use to reach conclusions about [his] medical impairment(s) and ... its effect on [his] ability to work on a sustained basis.'" *Cranfield v. Commissioner, Social Security,*  79 Fed.Appx. 852, 858, 2003 WL 22506409, *5 (6th Cir. November 3, 2003)(citing § 404.1512(a)).  The existing medical records for the applicable period, read alongside the ones created after the April, 2012 accident, do not establish Plaintiff's claim of disability. Because substantial evidence supports the finding that Plaintiff was not disabled on or before April 4, 2012, a remand is not warranted.

In closing, the decision to uphold the ALJ's findings should not be read to trivialize Plaintiff's current, well established functional difficulties. Nonetheless, the determination that the Plaintiff was not disabled until April 5, 2012 is generously within the "zone of choice" accorded to the fact-finder at the administrative hearing level and should not be disturbed by this Court. *Mullen v. Bowen*, *supra*.

## CONCLUSION

For these reasons, I recommend that Defendant's Motion for Summary Judgment be GRANTED, and that Plaintiff's Motion for Summary Judgment be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than 20 pages in length

unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

          s/R. Steven Whalen
          R. STEVEN WHALEN
          UNITED STATES MAGISTRATE JUDGE

Dated: February 20, 2015

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was sent to parties of record on February 20, 2015, electronically and/or by U.S. mail.

          s/Carolyn M. Ciesla
          Case Manager